

U.S. Department of Justice

*United States Attorney*
*District of Maryland*



*Leo J. Wise*
*Assistant United States Attorney*
*Leo.Wise@usdoj.gov*

*Suite 400*
*36 S. Charles Street*
*Baltimore, MD 21201-3119*

DIRECT: 410-209-4909
MAIN: 410-209-4800
FAX: 410-962-3092

November 30, 2017

Gary Proctor, Esquire
Law Office of Gary Proctor LLC
8 E Mulberry Street
Baltimore, Maryland 21202

Re: *United States v. Thomas Allers,* Cr. No. CCB 17-0452

Dear Counsel:

This letter, together with the Sealed Supplement, confirms the plea agreement which has been offered to the Defendant by the United States Attorney's Office for the District of Maryland ("this Office"). If the Defendant accepts this offer, please have him execute it in the spaces provided below. If this offer has not been accepted by December 1, 2017, it will be deemed withdrawn. The terms of the agreement are as follows:

Offense of Conviction

1. The Defendant agrees to plead guilty to Counts One of the Indictment now pending against him, charging him with racketeering conspiracy, in violation of 18 U.S.C. § 1962(d). The Defendant admits that he is, in fact, guilty of this offense and will so advise the Court.

2. The elements of the offense to which the Defendant has agreed to plead guilty, and which this Office would prove if the case went to trial, are as follows:

    a. First, that an enterprise existed as alleged in the indictment;

    b. Second, that the enterprise affected interstate or foreign commerce;

    c. Third, that the defendant was associated with or employed by the enterprise; and

1

    d. Fourth, that the defendant knowingly and willfully became a member of the conspiracy.

## Penalties

3. The maximum sentences provided by statute for the offenses to which the Defendant is pleading guilty are as follows: a 20-year term of incarceration, 3 years of supervised release and a fine of fine not more than twice gross proceeds derived from the offense.

4. In addition, the Defendant must pay $100 as a special assessment pursuant to 18 U.S.C. § 3013, which will be due and should be paid at or before the time of sentencing. This Court may also order him to make restitution pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664.[1] If a fine or restitution is imposed, it shall be payable immediately, unless, pursuant to 18 U.S.C. § 3572(d), the Court orders otherwise. The Defendant understands that if he serves a term of imprisonment, is released on supervised release, and then violates the conditions of his supervised release, his supervised release could be revoked - even on the last day of the term - and the Defendant could be returned to custody to serve another period of incarceration and a new term of supervised release. The Defendant understands that the Bureau of Prisons has sole discretion in designating the institution at which the Defendant will serve any term of imprisonment imposed.

## Waiver of Rights

5. The Defendant understands that by entering into this agreement, he surrenders certain rights as outlined below:

    a. If the Defendant had persisted in his plea of not guilty, he would have had the right to a speedy jury trial with the close assistance of competent counsel. That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

    b. If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count. The jury would be instructed that the

---

[1]     Pursuant to 18 U.S.C. § 3612, if the Court imposes a fine in excess of $2,500 that remains unpaid 15 days after it is imposed, the Defendant shall be charged interest on that fine, unless the Court modifies the interest payment in accordance with 18 U.S.C. § 3612(f)(3).

Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

c. If the Defendant went to trial, the government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in his defense, however, he would have the subpoena power of the Court to compel the witnesses to attend.

d. The Defendant would have the right to testify in his own defense if he so chose, and he would have the right to refuse to testify. If he chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from his decision not to testify.

e. If the Defendant were found guilty after a trial, he would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges against him. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

f. By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence. By pleading guilty, the Defendant understands that he may have to answer the Court's questions both about the rights he is giving up and about the facts of his case. Any statements the Defendant makes during such a hearing would not be admissible against him during a trial except in a criminal proceeding for perjury or false statement.

g. If the Court accepts the Defendant's plea of guilty, there will be no further trial or proceeding of any kind, and the Court will find him guilty.

h. By pleading guilty, the Defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status.

i. The Defendant recognizes that if he is not a citizen of the United States, pleading guilty may have consequences with respect to his immigration status. Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States. Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including his attorney or the Court, can predict with certainty the effect of a conviction on immigration status. Defendant

nevertheless affirms that he wants to plead guilty regardless of any potential immigration consequences.

## Advisory Sentencing Guidelines Apply

6. The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. §§ 3551-3742 (excepting 18 U.S.C. §§ 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

## Factual and Advisory Guidelines Stipulation

7. This Office and the Defendant understand, agree and stipulate to the Statement of Facts set forth in Attachment A hereto which this Office would prove beyond a reasonable doubt.

8. The parties agree that pursuant to U.S.S.G. § 1B1.2, "[a] conviction on a count charging a conspiracy to commit more than one offense shall be treated as if the defendant had been convicted on a separate count of conspiracy for each offense that the defendant conspired to commit." Similarly, pursuant to U.S.S.G. § 2E1.1(a)(2) & Application Note 1, because this is a case charging racketeering conspiracy where there is more than one underlying offense, each underlying offense is to be treated as if it were contained in a separate count of conviction for purposes of determining the base offense level. The parties agree that the advisory sentencing guidelines for racketeering conspiracy are U.S.S.G. § 2E1.1, the advisory sentencing guideline for the robberies charged in the Superseding Indictment are U.S.S.G. § 2B3.1 and the advisory sentencing guidelines for the overtime fraud charged in the Superseding Indictment is U.S.S.G. § 2B1.1. The parties further agree that in order to determine whether the base offense level should be the base offense level for racketeering, 19 or the offense level from the underlying activity, Chapter 3, Parts A, B, C & D, must be applied. U.S.S.G. § 2E1.1(a)(2) & Application Note 1.

   a. Group 1 – March 11, 2014, Robbery of G.W. and Y.W.
      i. U.S.S.G. § 2B3.1, Robbery
         1) Base Offense Level: 20
         2) Firearm Possessed: +5
         3) Physical restraint of victim: +2
      ii. Leader / organizer of criminal activity: +2 (3B1.1(c))
      iii. Abuse of trust: +2 (U.S.S.G. § 3B1.3)
      iv. Obstruction: +2 (U.S.S.G. § 3C1.1)

4

      v. Total: 33

  b. Group 2 – October 8, 2014, Robbery of D.K.
      i. U.S.S.G. § 2B3.1, Robbery
          1) Base Offense Level: 20
          2) Firearm Possessed: +5
      ii. Leader / organizer of criminal activity: +2 (3B1.1(c))
      ii. Abuse of trust: +2 (U.S.S.G. § 3B1.3)
      iii. Obstruction: +2 (U.S.S.G. § 3C1.1)
      iv. Total: 31

  b. Group 3 – April 3, 2015, Robbery of D.M. and D.R.
      i. U.S.S.G. § 2B3.1, Robbery
          4) Base Offense Level: 20
          5) Firearm Possessed: +5
          6) Physical restraint of victim: +2
      ii. Leader / organizer of criminal activity: +2 (3B1.1(c))
      iii. Abuse of trust: +2 (U.S.S.G. § 3B1.3)
      iv. Obstruction: +2 (U.S.S.G. § 3C1.1)
      v. Total: 33

  c. Group 4 – July 31, 2015, Robbery of Z.N. and C.J.
      i. U.S.S.G. § 2B3.1, Robbery
          7) Base Offense Level: 20
          8) Firearm Possessed: +5
          9) Physical restraint of victim: +2
      ii. Leader / organizer of criminal activity: +2 (3B1.1(c))
      iii. Abuse of trust: +2 (U.S.S.G. § 3B1.3)
      iv. Obstruction: +2 (U.S.S.G. § 3C1.1)
      v. Total: 33

  d. Group 5 – February 10, 2016, Robbery of P.E.
      i. U.S.S.G. § 2B3.1, Robbery
          10) Base Offense Level: 20
          11) Firearm Possessed: +5
          12) Physical restraint of victim: +2
      ii. Leader / organizer of criminal activity: +2 (3B1.1(c))
      iii. Abuse of trust: +2 (U.S.S.G. § 3B1.3)
      iv. Obstruction: +2 (U.S.S.G. § 3C1.1)
      v. Total: 33

    e. Group 6 – February 23, 2016, Robbery of B.C.
        i. U.S.S.G. § 2B3.1, Robbery
            13) Base Offense Level: 20
            14) Firearm Possessed: +5
            15) Physical restraint of victim: +2
        ii. Leader / organizer of criminal activity: +2 (3B1.1(c))
        iii. Abuse of trust: +2 (U.S.S.G. § 3B1.3)
        iv. Obstruction: +2 (U.S.S.G. § 3C1.1)
        v. Total: 33

    f. Group 7 – March 2, 2016, Robbery of B.H. and T.A.
        i. U.S.S.G. § 2B3.1, Robbery
            16) Base Offense Level: 20
            17) Firearm Possessed: +5
            18) Physical restraint of victim: +2
        ii. Leader / organizer of criminal activity: +2 (3B1.1(c))
        iii. Abuse of trust: +2 (U.S.S.G. § 3B1.3)
        iv. Obstruction: +2 (U.S.S.G. § 3C1.1)
        v. Total: 33

    g. Group 8 – April 28, 2016, Robbery of L.W. and D.R.
        i. U.S.S.G. § 2B3.1, Robbery
            19) Base Offense Level: 20
            20) Firearm Possessed: +5
            21) Physical restraint of victim: +2
        ii. Leader / organizer of criminal activity: +2 (3B1.1(c))
        iii. Abuse of trust: +2 (U.S.S.G. § 3B1.3)
        iv. Obstruction: +2 (U.S.S.G. § 3C1.1)
        v. Total: 33

    h. Group 9 – May 28, 2016, Robbery of A.C.
        i. U.S.S.G. § 2B3.1, Robbery
            22) Base Offense Level: 20
            23) Firearm Possessed: +5
            24) Physical restraint of victim: +2
        ii. Leader / organizer of criminal activity: +2 (3B1.1(c))
        iii. Abuse of trust: +2 (U.S.S.G. § 3B1.3)
        iv. Obstruction: +2 (U.S.S.G. § 3C1.1)
        v. Total: 33

The parties agree that pursuant to U.S.S.G. § 3D1.4, groups 1-9 total 9 units. Therefore, since there are 9 units, 5 levels are added to the group with the highest offense level, which is Group 1, resulting in a total offense level of 38. Since 38 is higher than 19, pursuant to U.S.S.G. § 2E1.1, **38 is the total offense level.**

9. This Office does not oppose a two-level reduction in the Defendant's adjusted offense level, based upon the Defendant's apparent recognition and affirmative acceptance of personal responsibility for his criminal conduct. This Office will ~~not~~ make a motion pursuant to U.S.S.G. § 3E1.1(b) for an additional one-level decrease for a timely notification of the Defendant's intention to plead guilty since none was forthcoming. **These reductions result in an adjusted offense level of 35.**

10. This Office may oppose *any* adjustment for acceptance of responsibility if the Defendant (a) fails to admit each and every item in the factual stipulation; (b) denies involvement in the offense; (c) gives conflicting statements about his involvement in the offense; (d) is untruthful with the Court, this Office, or the United States Probation Office; (e) obstructs or attempts to obstruct justice prior to sentencing; (f) engages in any criminal conduct between the date of this agreement and the date of sentencing; or (g) attempts to withdraw his plea of guilty.

11. The Defendant understands that there is no agreement as to his criminal history or criminal history category, and that his criminal history could alter his offense level if he is a career offender or if the instant offense was a part of a pattern of criminal conduct from which he derived a substantial portion of his income.

12. This Office and the Defendant agree that with respect to the calculation of the advisory guidelines range, no other offense characteristics, sentencing guidelines factors, potential departures or adjustments set forth in the United States Sentencing Guidelines will be raised or are in dispute.

13. The Defendant and this Office have reserved the right to argue for any factor under 18 U.S.C. § 3553(a) that could take the sentence outside of the advisory guidelines range.

## Obligations of the United States Attorney's Office

14. At the time of sentencing, this Office will recommend a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in 18 U.S.C. § 3553(a).

15. The parties reserve the right to bring to the Court's attention at the time of sentencing, and the Court will be entitled to consider, all relevant information concerning the Defendant's background, character and conduct, including any uncharged conduct. *and will move to dismiss the other pending counts*

7

## Restitution

16. The Defendant agrees to the entry of a Restitution Order for the full amount of the victim's losses. The Defendant agrees that, pursuant to 18 U.S.C. §§ 3663 and 3663A and §§ 3563(b)(2) and 3583(d), the Court may order restitution of the full amount of the actual, total loss caused by the offense conduct. The Defendant further agrees that he will fully disclose to the probation officer and to the Court, subject to the penalty of perjury, all information, including but not limited to copies of all relevant bank and financial records, regarding the current location and prior disposition of all funds obtained as a result of the criminal conduct set forth in the factual stipulation. The Defendant further agrees to take all reasonable steps to retrieve or repatriate any such funds and to make them available for restitution. If the Defendant does not fulfill this provision, it will be considered a material breach of this plea agreement, and this Office may seek to be relieved of its obligations under this agreement.

## Collection of Financial Obligations

17. The Defendant expressly authorizes the U.S. Attorney's Office to obtain a credit report in order to evaluate the Defendant's ability to satisfy any financial obligation imposed by the Court.

18. In order to facilitate the collection of financial obligations to be imposed in connection with this prosecution, the Defendant agrees to disclose fully all assets in which the Defendant has any interest or over which the Defendant exercises control, directly or indirectly, including those held by a spouse, nominee or other third party.

19. The Defendant will promptly submit a completed financial statement to the United States Attorney's Office, in a form this Office prescribes and as it directs. The Defendant promises that the financial statement and disclosures will be complete, accurate and truthful, and understands that any willful falsehood on the financial statement will be a separate crime and may be punished under 18 U.S.C. § 1001 by an additional five years' incarceration and fine.

## Waiver of Appeal

20. In exchange for the concessions made by this Office and the Defendant in this plea agreement, this Office and the Defendant waive their rights to appeal as follows:

    a. The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or otherwise, to appeal the Defendant's conviction;

    b. The Defendant and this Office knowingly waive all right, pursuant to 18 U.S.C. § 3742 or otherwise, to appeal whatever sentence is imposed, including the right to appeal any issues that relate to the establishment of the advisory guidelines range, the determination of the defendant's criminal history, the weighing of the sentencing factors, and the decision whether to impose and the calculation of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised.

    c. Nothing in this agreement shall be construed to prevent the Defendant or this Office from invoking the provisions of Federal Rule of Criminal Procedure 35(a), or from appealing from any decision thereunder, should a sentence be imposed that resulted from arithmetical, technical, or other clear error.

    d. The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from this Office or any investigating agency.

### Obstruction or Other Violations of Law

21. The Defendant agrees that he will not commit any offense in violation of federal, state or local law between the date of this agreement and his sentencing in this case. In the event that the Defendant (i) engages in conduct after the date of this agreement which would justify a finding of obstruction of justice under U.S.S.G. § 3C1.1, or (ii) fails to accept personal responsibility for his conduct by failing to acknowledge his guilt to the probation officer who prepares the Presentence Report, or (iii) commits any offense in violation of federal, state or local law, then this Office will be relieved of its obligations to the Defendant as reflected in this agreement. Specifically, this Office will be free to argue sentencing guidelines factors other than those stipulated in this agreement, and it will also be free to make sentencing recommendations other than those set out in this agreement. As with any alleged breach of this agreement, this Office will bear the burden of convincing the Court of the Defendant's obstructive or unlawful behavior and/or failure to acknowledge personal responsibility by a preponderance of the evidence. The Defendant acknowledges that he may not withdraw his guilty plea because this Office is relieved of its obligations under the agreement pursuant to this paragraph.

### Court Not a Party

22. The Defendant expressly understands that the Court is not a party to this agreement. In the federal system, the sentence to be imposed is within the sole discretion of the Court. In particular, the Defendant understands that neither the United States Probation Office nor the Court is bound by the stipulation set forth above, and that the Court will, with the aid of the Presentence Report, determine the facts relevant to sentencing. The Defendant understands that the Court cannot rely exclusively upon the stipulation in ascertaining the

factors relevant to the determination of sentence. Rather, in determining the factual basis for the sentence, the Court will consider the stipulation, together with the results of the presentence investigation, and any other relevant information. The Defendant understands that the Court is under no obligation to accept this Office's recommendations, and the Court has the power to impose a sentence up to and including the statutory maximum stated above. The Defendant understands that if the Court ascertains factors different from those contained in the stipulation set forth above, or if the Court should impose any sentence up to the maximum established by statute, the Defendant cannot, for that reason alone, withdraw his guilty plea, and will remain bound to fulfill all of his obligations under this agreement. The Defendant understands that neither the prosecutor, his counsel, nor the Court can make a binding prediction, promise, or representation as to what guidelines range or sentence the Defendant will receive. The Defendant agrees that no one has made such a binding prediction or promise.

### Entire Agreement

23. This letter supersedes any prior understandings, promises, or conditions between this Office and the Defendant and, together with the Sealed Supplement, constitutes the complete plea agreement in this case. The Defendant acknowledges that there are no other agreements, promises, undertakings or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement and none will be entered into unless in writing and signed by all parties.

If the Defendant fully accepts each and every term and condition of this agreement, please sign and have the Defendant sign the original and return it to me promptly.

Very truly yours,

Stephen M. Schenning
Acting United States Attorney

By: _____

Leo J. Wise
Derek E. Hines
Assistant United States Attorneys

10

I have read this agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorney. I understand it, and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney, and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

12-1-17
Date

_____
Thomas Allers

I am the Defendant's attorney. I have carefully reviewed every part of this agreement, including the Sealed Supplement, with him. He advises me that he understands and accepts its terms. To my knowledge, his decision to enter into this agreement is an informed and voluntary one.

12-1-17
Date

_____
Gary Proctor, Esq.

11

## ATTACHMENT A
## STATEMENT OF FACTS

It is agreed and stipulated that were the Government to proceed to trial in this case, it would prove, beyond a reasonable doubt, by admissible testimonial and documentary evidence the guilt of the Defendant on the charges of racketeering conspiracy, in violation of 18 U.S.C. § 1962(d) and possession of a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c).

This Office and the Defendant understand, agree and stipulate to the following statement of facts and the Defendant acknowledges that it does not represent all the evidence the Government would have produced had the case proceeded to trial.

1. The Defendant, Thomas Allers ("ALLERS"), joined the Baltimore Police Department ("BPD") an agency of the State of Maryland whose jurisdiction covers Maryland's largest city, Baltimore, on ~~May 18, 2009.~~ July 22, 1996.

2. The BPD constituted an "enterprise," as defined in Title 18, United States Code, Section 1961(4). The BPD engaged in, and its activities affected, interstate commerce.

3. The Gun Trace Task Force ("GTTF") was a specialized unit within the Operational Investigation Division of the BPD. The primary mission of the GTTF was the tracking and tracing of recovered firearms in order to identify and suppress the possession, purchasing, and trafficking of illegal firearms within Baltimore City, and to assist with the investigation and prosecution of firearms-related offenses.

4. ALLERS became the officer-in-charge of the GTTF on or about July 25, 2013 and was reassigned out of the GTTF on June 14, 2016. Detectives Momodu Gondo, Jemell Rayam and others served under ALLERS on the GTTF.

5. The purpose of the BPD was to protect and preserve life, protect property, understand and serve the needs of the Baltimore City's neighborhoods, and to improve the quality of life in Baltimore City.

6. The purposes of the Defendant and his co-defendants included violating the legitimate purposes of the BPD in order to enrich themselves through illegal conduct, including extortion, robbery and time and attendance fraud.

7. Among the means and methods by which the defendant and others pursued their illegal purposes were the following:

    a. ALLERS, Gondo and Rayam stole cash from civilians when searching their residences and businesses.

    b. ALLERS released detainees and chose not to charge them criminally when he stole cash from them.

12

    c. In order to conceal their criminal conduct, Gondo and Rayam and other members of the conspiracy authored false incident and arrest reports approved by ALLERS; or, the members of the conspiracy prepared no paperwork whatsoever documenting their encounters with detainees and arrestees.

    d. ALLERS became aware that Gondo and Rayam were under investigation and, instead of holding that information in confidence, tipped them off in order to thwart law enforcement efforts.

8. ALLERS agrees that he associated with the enterprise described in the Indictment and knowingly became a member of the conspiracy described in the Indictment.

### Robberies

9. While serving as a BPD officer, ALLERS robbed civilians he detained, and in some cases arrested, and stole money from them. ALLERS did this when he was the officer-in-charge of the GTTF. At times, ALLERS shared the proceeds with co-conspirators Momodu Gondo and Jemell Rayam and on other occasions, he kept all of the proceeds for himself.

10. ALLERS admits that he participated in the specific robberies listed below, among others. Further, ALLERS admits he was armed with his BPD service firearm during the commission of these robberies, that individual victims of the robberies were physically restrained to facilitate the commission of the offense, and that he approved false and fraudulent incident reports and other official documents in some cases in order to conceal his and his co-defendants' criminal conduct and otherwise obstruct justice.

    **a. March 11, 2014, Robbery of G.W. and Y.W.**

11. On or about March 11, 2014, Sergeant ALLERS and Detectives Gondo and Rayam, while acting in their capacity as police officers, executed a search warrant at the residence of G.W. and Y.W. located in Baltimore County, Maryland, after having arrested G.W.

12. G.W. had approximately $416,000 in the residence at the time of the search. Y.W. had approximately $1500 to $2000 in the house at the time of the search.

13. Prior to calling Baltimore County law enforcement to the scene, ALLERS, Gondo and Rayam searched the house and located a drawer full of money in an upstairs bedroom. The money was bundled in multiple stacks. ALLERS told Gondo and Rayam that the homeowner, "wouldn't miss a stack" or words to that effect and ALLERS took a stack of cash from the money in the drawer. Gondo and Rayam then each took a stack of cash which contained approximately $8,000 to $10,000.

14. When Baltimore County law enforcement arrived they seized the remaining cash from the residence, which amounted to $350,204.

### b. October 8, 2014, Robbery of D.K.

15. On or about October 8, 2014, Sergeant ALLERS and Detectives Gondo, Rayam and J.C., acting in their capacity as police officers, entered a store owned by D.K. in Baltimore City to execute a search warrant.

16. D.K. had approximately $9,000 in cash in his apartment above the store.

17. ALLERS stole $3,000 of the $9,000. The remaining $6,000 was recovered by the U.S. Marshals Service.

18. To conceal his illegal conduct, on or about October 8, 2014, ALLERS approved an incident report authored by J.C. that was filed with the BPD. Above his signature, ALLERS certified that, "I affirm and declare that the statements above are true to the best of my knowledge." ALLERS approved the report knowing that it falsely stated that an "Undetermined Amount U.S. Currency (Recovered by Store, Seized by U.S. Marshal Service)" had been seized when, in truth and fact, only $6,000 of the $9,000 that had been at the location was recovered by the U.S. Marshals Service because ALLERS stole the rest.

### c. April 3, 2015, Robbery of D.M. and D.R.

19. On or about April 3, 2015, Sergeant ALLERS and Detectives Gondo, Rayam and J.C., acting in their capacity as police officers, entered the residence of D.M. and D.R. in Baltimore City to execute a search warrant.

20. At the time of the search, D.M. and his wife had approximately $6,000 in their home which was a combination of money that D.M. had made buying and selling used cars and a tax refund his wife, D.R., had received.

21. During the execution of the search warrant, Gondo located money in a portfolio and gave the money to Rayam  ALLERS then instructed Gondo and Rayam to "just do this here," or words to that effect, which Gondo and Rayam understood to mean that they should take the money and split it with ALLERS. ALLERS, Gondo, and Rayam stole approximately $5700 from D.M. and D.R.

22. To conceal his illegal conduct, on or about April 3, 2015, ALLERS approved an incident report authored by J.C. that was filed with the BPD. Above his signature, ALLERS certified that, "I affirm and declare that the statements above are true to the best of my knowledge." ALLERS approved the report knowing that it falsely stated that $233 had been recovered from the search of D.M. and D.R.'s home when, in truth and fact, ALLERS, Gondo and Rayam seized $6,000.

### d. July 31, 2015, Robbery of Z.N. and C.J.

23. On or about July 31, 2015, Sergeant ALLERS and Detectives Gondo and Rayam, acting in their capacity as police officers, entered Z.N. and C.J.'s home in Anne Arundel County, Maryland, to execute a search warrant.

24. Before Anne Arundel County police department personnel arrived, Gondo and Rayam found $10,000 and stole $8,900 of it. The remaining cash was recovered by Anne Arundel County Police Department.

25. After ALLERS, Gondo and Rayam left the residence they went to a bar/restaurant in Baltimore City and Rayam gave ALLERS his share of the stolen cash. Rayam and Gondo split the rest.

### e. February 10, 2016, Robbery of P.E.

26. On or about February 10, 2016, Sergeant ALLERS and Detectives Gondo and Rayam, acting in their capacity as police officers, executed a search warrant at P.E.'s home in Baltimore City.

27. ALLERS, Gondo and Rayam found approximately $10,000 in P.E.'s bedroom. P.E. had been counting the money when ALLERS, Gondo and Rayam entered his home. ALLERS, Gondo and Rayam stole approximately $8,300.

28. To conceal his illegal conduct, on or about February 10, 2016, ALLERS approved an incident report, authored by Rayam. Above his signature, ALLERS certified that, "I affirm and declare that the statements above are true to the best of my knowledge." ALLERS approved the report knowing that it falsely stated that only $1,684 had been seized from P.E., in truth and fact, ALLERS, Gondo and Rayam seized approximately $10,000.

### f. February 23, 2016, Robbery of B.C.

29. On or about February 23, 2016, Sergeant ALLERS and Detectives Gondo, and Rayam, acting in their capacity as police officers, executed a search warrant in a home in Baltimore County where B.C. had been renting a room.

30. When ALLERS, Gondo and Rayam entered the home, they put B.C. and the person who owned the home in handcuffs. Before Baltimore County Police Department arrived, ALLERS, Gondo and Rayam located a handgun from the bedroom where B.C. was staying. B.C. also had $7,000 in that room, which ALLERS, Gondo and Rayam stole.

31. When Baltimore County Police Department arrived on the scene, they seized the firearm and took B.C. into their custody.

32. To conceal his illegal conduct, on or about February 23, 2016, ALLERS approved an incident report, authored by Gondo. Above his signature, ALLERS certified that, "I affirm and declare that the statements above are true to the best of my knowledge." ALLERS approved the report knowing it falsely stated that the only property recovered from the home was an "Amt Auto Mag 11, 22 magnum S/N Z60351," when in truth and fact ALLERS, Gondo and Rayam seized $7,000.

### g. March 2, 2016, Robbery of B.H. and T.A.

33. On or about March 2, 2016, Sergeant ALLERS and Detectives J.C., Hersl, Gondo, and Rayam, acting in their capacity as police officers, executed a search warrant at B.H. and T.A.'s home in Baltimore City.

34. At the time of the search, T.A. had $200 in her purse, which her daughter had received the previous day during her birthday party, $900 to pay her rent for that month, $300 to pay down the amount of money she owed Baltimore Gas & Electric for utilities and $8,000 which was the proceeds of B.H.'s drug sales. T.A. was a certified nursing assistant and had earned her rent money and the money she was intending to use to pay down her BG&E bill.

35. When ALLERS and the other members of the GTTF entered the house, T.A. was at home with her younger child. ALLERS and the other members of the GTTF also brought B.H. into the house, in handcuffs, after having arrested him outside the residence.

36. ALLERS stole some of the cash that T.A. and B.H. had in their home. ALLERS told Rayam, "here is some lunch money," or words to that effect, and gave him a small portion of the money that ALLERS stole.

37. To conceal his illegal conduct, on or about March 2, 2016, ALLERS approved an incident report, authored by Hersl. Above his signature, ALLERS certified that, "I affirm and declare that the statements above are true to the best of my knowledge." ALLERS approved the report knowing that it falsely stated that only $1,624 had been seized from B.H. when, in truth and fact, ALLERS had stolen money from from B.H. and T.A.

### h. April 28, 2016, Robbery of L.W. and D.R.

38. On or about April 28, 2016, Sergeant ALLERS and Detectives Hersl, Gondo, and Rayam, acting in their capacity as police officers, arrested D.R. After D.R. was in custody, ALLERS, Hersl, Gondo, and Rayam went inside the home where D.R. was living and obtained consent from L.W., who lived with D.R. and their two children, to search the house.

16

39. L.W. and D.R. had over $10,000 in their home at the time of the search. ALLERS stole over $10,000 during the search. Following the search, D.R. was shot and killed because he could not repay a drug-related debt.

40. To conceal his illegal conduct, on or about April 28, 2016, ALLERS approved an incident report, authored by Rayam. Above his signature, ALLERS certified that, "I affirm and declare that the statements above are true to the best of my knowledge." ALLERS approved the report knowing that it falsely stated that the only property seized was two handguns and ammunition when, in truth and fact, ALLERS had stolen more than $10,000 from L.W. and D.R.

### i. May 28, 2016, Robbery of A.C.

41. On or about May 28, 2016, Sergeant ALLERS and Detectives Hersl, Gondo, and Rayam, acting in their capacity as police officers, arrested A.C. After A.C. was in custody, ALLERS, Hersl, Gondo, and Rayam went to the home where A.C. was living in Anne Arundel County and obtained consent from the homeowner, D.W., who was A.C.'s grandmother, to search the house.

42. A.C. had $1,000 in the basement where he slept. ALLERS, Gondo, and Rayam stole approximately $700 of the $1,000 and gave Hersl the rest to give to D.W.